**HEWLETT–PACKARD COMPANY, Plaintiff/Cross–Appellant,**

v.

**BAUSCH & LOMB INCORPORATED, Defendant/Appellant.**

**Nos. 90–1016, 90–1017.**

United States Court of Appeals, Federal Circuit.

July 30, 1990.

---

1. We are told that R.S.R. Wholesaler Guns was    dismissed from the action upon taking a license.

Jonathan A. Marshall, Pennie & Edmonds, New York City, argued, for plaintiff/cross-appellant. Of counsel, were Brian D. Coggio, Jon R. Stark, Steven I. Wallach and John J. Normile, Pennie & Edmonds, and William H. MacAllister, Hewlett–Packard Co., Boise, Idaho.

Laurence H. Pretty, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., argued, for defendant/appellant. With him on the brief, were Mary Ann Tucker, and Bernard D. Bogdon, of Bausch & Lomb Inc., Rochester, N.Y. Of counsel, were Gary A. Clark and John T. Wiedemann, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal.

Before RICH and NEWMAN, Circuit Judges, and COWEN, Senior Circuit Judge.

RICH, Circuit Judge.

Bausch & Lomb Incorporated (B & L) appeals from the September 13, 1989 Judgment of the United States District Court for the Northern District of California, holding U.S. Pat. No. 4,384,298 (LaBarre) valid and infringed by B & L. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 722 F.Supp. 595, 13 USPQ2d 1105 (N.D.Cal.

1989). Hewlett–Packard Company (HP) cross-appeals from that portion of the Judgment holding that B & L had not actively induced infringement of the LaBarre patent subsequent to September of 1985. We affirm.

## BACKGROUND

Two patents are discussed extensively throughout this opinion. The first is the patent in suit, LaBarre, which is assigned to HP. The second is U.S. Pat. No. Re 31,684 (Yeiser), which is assigned to B & L and which is the sole piece of prior art argued by B & L to invalidate the LaBarre patent. Both patents relate to X–Y plotters used to create a two-dimensional plot, such as a chart or a graph, on a sheet of paper. Such plotters can be broadly divided into two categories: one in which the paper is held stationary and a pen is attached to a gantry movable in one direction (the Y-direction) and a carriage movable in a second, orthogonal direction (the X-direction); and another in which the paper is moved in the Y-direction, while the pen is attached to a carriage movable in the X-direction. Both LaBarre and Yeiser relate to this second type of plotter, and both show that the movement of the paper in the Y-direction can be effectuated by one or more pairs of pinch rollers between which the paper is placed.

In order to draw accurate plots, it is critical in devices like those disclosed in Yeiser and LaBarre that the paper be moved back and forth without slippage between the paper and the pinch rollers. With this in mind, Yeiser teaches that at least one of the pinch wheels should have a surface with a high coefficient of friction formed "by knurling or by a layer of rubber or the like." LaBarre, on the other hand, teaches that an efficient way to effectively eliminate slippage between the rollers and the paper is to simply cover one of the pinch wheels with silicon carbide grit.[1] The grit not only increases the friction between the pinch wheels and the pa-

per, but also causes small indentations to be formed in the paper. These indentations repeatedly mate with the grit as the paper is moved back and forth in the Y-direction, thus further inhibiting slippage between the pinch wheels and the paper. Due to this mating effect between the grit and the indentations in the paper, HP urges that the LaBarre printer should be considered to be a "positive drive" plotter, wherein the paper is drawn along using "teeth" (i.e., the grit) which engage in "holes" (i.e., the indentations) in the paper, as opposed to a "friction drive" plotter, wherein the moving force on the paper is caused simply by the friction between the wheels and the paper.

Claims 1 and 3 of the LaBarre patent are asserted against B & L, but only claim 1 is relevant to this opinion. It reads as follows:

1. An X–Y plotter system for forming images on a web comprising:

first means being coupled to at least one edge of said web for imparting motion thereto to provide a first degree of motion during plotting onto said web in response to a first applied signal;

second means for forming selected visual images on said web and being movable to provide a second degree of motion in response to a second applied signal; and

third means responsive to a third applied signal for imparting motion to said second means;

said first means including first drive means having at least one powered drive wheel contacting the web, and an idle wheel opposite to each of said drive wheels to form a pinch roller assembly with the web between the drive and idler wheels, one of said at least one drive and idler wheels having a rough surface, and said drive and idler wheels additionally being spring biased together to cause the rough surface to make a series of indentations along the driven edge of the web to minimize slippage with these indenta-

---

**1.** The grit is attached to the pinch wheel either directly by applying epoxy to the wheel and embedding the grit in the epoxy or indirectly by gluing common sandpaper (i.e., grit attached to a paper backing) to the wheel.

tions repeatedly mating with the rough surface of the drive wheel as the web is driven back and forth, wherein the rough surface on one of said at least one powered drive and idler wheels of the first drive means has a random pattern, size, and height of rough spots.

Claim 1 of LaBarre was specifically allowed by the Patent and Trademark Office (PTO) over the Yeiser patent. In particular, Yeiser was brought to the PTO examiner's attention by HP after the LaBarre application had been filed. A telephone interview was subsequently held between the examiner and HP's attorney during which the Yeiser patent was discussed. As a result of this discussion, the last phrase of claim 1, "wherein the rough surface ... has a random pattern, size, and height of rough spots," was added by amendment. Claim 1 was subsequently allowed.

B & L, through a division called Houston Instruments, began selling plotters having grit-covered pinch wheels ("grit wheel plotters") sometime in late 1982 or early 1983. However, in September of 1985, B & L entered into a "PURCHASE AGREEMENT" with Ametek, Inc. (Ametek) pursuant to which B & L sold the Houston Instruments division (including all "assets, properties, rights and business") to Ametek for a total purchase price of $43,000,000. Concurrent with execution of the PURCHASE AGREEMENT, B & L and Ametek also entered into an "AGREEMENT WITH RESPECT TO PATENTS," in which the parties agreed that, among other things, (1) B & L would grant Ametek a license under the Yeiser patent; (2) B & L would indemnify Ametek against liability for infringing the LaBarre patent up to a cap of $4.6 million; (3) B & L and Ametek would jointly work toward developing a plotter which would not infringe the LaBarre patent; and (4) Ametek would comply with a so-called "gag order;" (i.e., would not communicate with HP concerning the LaBarre patent).

HP brought the present suit against B & L in May of 1986, accusing B & L of direct infringement of the LaBarre patent for the time period prior to the sale of Houston Instruments to Ametek, and of active inducement of infringement under 35 U.S.C. § 271(b) for the period subsequent to the sale of Houston Instruments. As to the charge of direct infringement, B & L admitted infringement, but defended on the grounds that, among other things, the asserted claims of LaBarre were invalid for obviousness under 35 U.S.C. § 103 in view of the Yeiser patent. In particular, B & L argued that the knurled wheel taught by Yeiser would inherently create indentations which would mate with the rough surface of the knurled wheel, as required by the claims of LaBarre. As to the charge of inducing infringement, B & L denied that its activities surrounding the sale of Houston Instruments to Ametek in September of 1985 constituted active inducement of infringement.

The district court, in an extensive Findings of Fact, Conclusions of Law and Order Thereon, found claim 1 of LaBarre would not have been obvious in view of Yeiser and that B & L was liable for infringement prior to the sale of Houston Instruments in September of 1985. However, the district court further found that B & L did not actively induce infringement of the LaBarre patent by Ametek under 35 U.S.C. § 271(b), and so found no liability subsequent to the 1985 sale. These appeals followed.

## OPINION

### A. *Obviousness—35 U.S.C. § 103*

First of all, we note that the claims of LaBarre are entitled to a presumption of validity, and that B & L faces the burden of showing, by clear and convincing evidence, the invalidity of the claims. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed. Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). This burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application. *Id.*

The district court found three differences between the device of LaBarre claim 1 and the Yeiser device: one, the

application of a spring bias at a force sufficient to cause indentations; two, the creation of a "positive drive" system as opposed to a "friction drive" system; and three, the use of a random pattern of rough spots to create the indentations. We, however, feel that it is only necessary to focus on the third limitation and that this limitation is sufficient to render claim 1 unobvious in view of Yeiser.

The critical language is the last clause of claim 1: "wherein the rough surface ... has a random pattern, size, and height of rough spots." B & L agrees that the use of grit provides great advantages over a knurled wheel. In particular, grit is much harder and sharper than the points of a knurled wheel, and so is especially effective in creating indentations in the paper. However, B & L maintains that claim 1 does not specifically recite "grit," that it is improper to read the limitation of "grit" into the claims, and that therefore whatever unobvious advantages may be realized by the use of grit are irrelevant. Since, argues B & L, the use of a "random pattern, size and height of rough spots" on the wheel does not provide any "operational difference" over a knurled wheel, this limitation in claim 1 does not render claim 1 unobvious over Yeiser.

We find this argument without merit. The above-quoted language from claim 1 is a reasonable description of what "grit" is, and certainly encompasses "grit" while excluding other possible surfaces for the pinch rollers, including a knurled surface. For that reason, whatever superior and unexpected properties grit may have and whatever commercial success and other secondary considerations HP can show through the sale of grit wheel plotters, are certainly relevant and commensurate with the scope of the claim.

■ Secondly and more importantly, there is no requirement, as B & L implies,

that HP show "operational differences" of the claimed device over the prior art. Claim 1 of LaBarre is an apparatus claim, and apparatus claims cover what a device *is*, not what a device *does*. An invention need not *operate* differently than the prior art to be patentable, but need only *be* different.[2] *See, e.g., Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1390–91, 7 USPQ2d 1222, 1224–25 (Fed. Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988); *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1098, 227 USPQ 337, 348 (Fed.Cir.1985), *vacated*, 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986), *on remand*, 810 F.2d 1561, 1 USPQ2d 1593 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). In the present case, the language "random pattern, size, and height of rough spots" *is* certainly *different* than the surface of a knurled wheel. Therefore, the sole issue is whether it would have been obvious, to one of ordinary skill in the art, to replace the knurled wheel of Yeiser with a wheel having a random pattern, size and shape of rough spots. By focussing its argument on the alleged lack of "operational differences" between the device of the claim language and the prior art, B & L has utterly failed to point out any evidence, much less clear and convincing evidence, of *why* one skilled in the art would replace the knurled wheel of Yeiser with one having a random pattern, size and shape of rough spots.

### B. *Active Inducement—35 U.S.C. § 271(b)*

Section 271(b) provides that "Whoever actively induces infringement of a patent shall be liable as an infringer." At the outset, we feel that it is necessary to make clear the distinction, often confused, between active inducement of infringement under § 271(b) and contributory infringement under § 271(c).[3] Prior to the enact-

---

**2.** Or perhaps more accurately, be *unobviously* different.

**3.** 35 U.S.C. § 271(c) provides that:

(c) Whoever sells a component of a patented machine, manufacture, combination or com-

position, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity

ment of the Patent Act of 1952, there was no statute which defined what constituted infringement. However, infringement was judicially divided into two categories: "direct infringement," which was the unauthorized making, using or selling of the patented invention, and "contributory infringement," which was any other activity where, although not technically making, using or selling, the defendant displayed sufficient culpability to be held liable as an infringer. *See, e.g., Henry v. A.B. Dick Co.*, 224 U.S. 1, 33–34, 32 S.Ct. 364, 373, 56 L.Ed. 645 (1912); *Thomson–Houston Elec. Co. v. Ohio Brass Co.*, 80 F. 712, 721 (6th Cir. 1897). Such liability was under a theory of joint tortfeasance, wherein one who intentionally caused, or aided and abetted, the commission of a tort by another was jointly and severally liable with the primary tortfeasor. *Thomson–Houston*, 80 F. at 721; *Tubular Rivet & Stud Co. v. O'Brien*, 93 F. 200, 202–05 (C.C.D.Mass.1898).

The most common pre–1952 contributory infringement cases dealt with the situation where a seller would sell a component which was not itself technically covered by the claims of a product or process patent but which had no other use except with the claimed product or process. In such cases, although a plaintiff was required to show intent to cause infringement in order to establish contributory infringement, many courts held that such intent could be presumed because the component had no substantial non-infringing use. *See Henry v. A.B. Dick*, 224 U.S. at 48, 32 S.Ct. at 379.

The legislative history of the Patent Act of 1952 indicates that no substantive change in the scope of what constituted "contributory infringement" was intended by the enactment of § 271. *See* S.Rep. No. 1979, 82d Cong., 2d Sess. 8, 28 (1952), U.S. Code Cong. & Admin.News 1952, p. 2394; *Aro Mfg. Co. v. Convertible Top Replace-*

ment Co., 377 U.S. 476, 485–86, 84 S.Ct. 1526, 1531–32, 12 L.Ed.2d 457 (1964) ("*Aro II*"). However, the single concept of "contributory infringement" was divided between §§ 271(b) and 271(c) into "active inducement" (a type of direct infringement) and "contributory infringement," respectively. Section 271(c) codified the prohibition against the common type of contributory infringement referred to above, and made clear that only proof of a defendant's *knowledge*, not *intent*, that his activity cause infringement was necessary to establish contributory infringement.[4] Section 271(b) codified the prohibition against all other types of activity which, prior to 1952, had constituted "contributory infringement."

That, however, leaves open the question of what level of knowledge or intent is required to find active inducement under § 271(b). On its face, § 271(b) is much broader than § 271(c) and certainly does not speak of any intent requirement to prove active inducement. However, in view of the very definition of "active inducement" in pre–1952 case law and the fact that § 271(b) was intended as merely a codification of pre–1952 law, we are of the opinion that proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.[5] And it is proof of that intent which is missing in the present case.

Looking at the totality of events surrounding the sale of Houston Instruments, it is clear that B & L was merely interested in divesting itself of Houston Instruments at the highest possible price. B & L had no interest in what Ametek did with Houston Instruments and certainly did not care one way or the other whether Houston Instruments, under Ametek's ownership, continued to make grit wheel plotters. HP attempts to make much of the fact that part

---

of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

**4.** Although not clear on the face of the statute, subsequent case law held that § 271(c) required not only knowledge that the component was especially made or adapted for a particular use

but also knowledge of the patent which proscribed that use. *See Aro II*, 377 U.S. at 488, 84 S.Ct. at 1533.

**5.** *See Water Technologies v. Calco, Ltd.*, 850 F.2d 660, 668, 7 USPQ2d 1097, 1103 (Fed.Cir.1988), holding such intent is necessary and that it may be shown by circumstantial evidence.

of the sale of Houston Instruments included the sale of specific plans for making grit wheel plotters as well as key personnel knowledgeable in this area. However, this is simply a result of the fact that Houston Instruments was sold "lock, stock and barrel" (i.e. with all "assets, properties, rights and business" included).[6] B & L had no interest in nor control over what Ametek chose to do with the plans or the personnel. In this regard, it should also be kept in mind that grit wheel plotters constituted only a portion of Houston Instruments' sales. The PURCHASE AGREEMENT between B & L and Ametek indicates that Houston Instruments was also in the business of developing, manufacturing and selling analog and digital recorders, digitizers, computer-assisted drafting equipment, and other products.

We do not find any of the remaining details of the agreement between B & L and Ametek to be sufficiently probative of intent to induce infringement. The grant of a license from B & L to Ametek under the Yeiser patent is not probative of any intent to induce infringement. The license agreement between B & L and Ametek did not purport to give Ametek the right to make, use and sell X–Y plotters; it merely freed Ametek from whatever bar the Yeiser patent would have been to such activity. Both parties clearly knew, as evidenced by their discussion of the LaBarre patent in the AGREEMENT WITH RESPECT TO PATENTS, that other patents could still be a bar to making, using and selling X–Y plotters. The agreement between B & L and Ametek to work together to find a way to avoid infringement of the LaBarre patent establishes, if anything, an intent by B & L *not* to induce infringement by helping Ametek to develop a plotter which would not infringe.

The most troubling aspect of the agreement between B & L and Ametek is the indemnification clause. Cases have held that an indemnification agreement will generally not establish an intent to induce infringement, but that such intent can be inferred when the primary purpose is to overcome the deterrent effect that the patent laws have on would-be infringers. *See* Miller, "Some Views on the Law of Patent Infringement by Inducement," 53 J.Pat. Off.Soc'y 86, 150–51 (1971), and the cases cited therein. While overcoming the deterrent of the patent laws *might* have been the ultimate effect of the indemnification agreement in the present case, we cannot say that that was its purpose. We are once again led back to our conclusion that what B & L really wanted out of this agreement was the sale of Houston Instruments at the greatest possible price. Therefore B & L agreed that, if Ametek should wish to continue the manufacture and sale of grit-wheel plotters, B & L would bear the risk of those plotters ultimately being found to infringe the LaBarre patent. The indemnification agreement certainly facilitated the sale of Houston Instruments at the particular price at which it was sold, but we cannot agree that B & L used it to induce infringement by Ametek.

### CONCLUSION

The district court's decision holding the LaBarre patent valid and holding B & L not liable for the period subsequent to the sale of Houston Instruments is *affirmed.*

AFFIRMED.

---

**6.** Although the employees of Houston Instruments were technically not "sold" with the business, it is completely reasonable that Ametek would retain most of the employees, especially the technical personnel.