# United States Court of Appeals for the Federal Circuit

03-1600,-1616

MERCEXCHANGE, L.L.C.,

Plaintiff-Cross Appellant,

v.

eBAY, INC. and HALF.COM, INC.,

Defendants-Appellants.

Scott L. Robertson, Hunton & Williams LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Jennifer A. Albert and Brian M. Buroker. Also on the brief were Gregory N. Stillman, of Norfolk, Virginia, and David M. Young, of McLean, Virginia.

Jeffrey G. Randall, Skadden, Arps, Slate, Meagher & Flom LLP, of Palo Alto, California, and Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendants-appellants. On the brief were Timothy S. Teter and Lori Ploeger, Cooley Godward LLP, of Palo Alto, California. Also on the brief was Allan M. Soobert, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC.

Appealed from: United States District Court for the Eastern District of Virginia

Judge Jerome B. Friedman

# United States Court of Appeals for the Federal Circuit

03-1600,-1616

MERCEXCHANGE, L.L.C.,

Plaintiff-Cross Appellant,

v.

eBAY, INC. and HALF.COM, INC.,

Defendants-Appellants.

_____

DECIDED:  March 16, 2005

_____

Before MICHEL,[*] <u>Chief Judge</u>, CLEVENGER, and BRYSON, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

MercExchange, L.L.C., is the assignee of three patents, U.S. Patent Nos. 5,845,265 ("the '265 patent"), 6,085,176 ("the '176 patent"), and 6,202,051 ("the '051 patent").  MercExchange filed suit against eBay, Inc.; Half.com, Inc.; and ReturnBuy, Inc., in the United States District Court for the Eastern District of Virginia, alleging willful infringement of the '265 patent by all three defendants, willful infringement of the '176 patent by eBay and Half.com, and willful infringement of the '051 patent by eBay.

_____

[*]     Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

eBay owns and operates a website on the Internet that allows buyers and sellers to search for goods and to purchase them by participating in live auctions or by buying them at a fixed price. At issue in this case is the fixed-price purchasing feature of eBay's website, which allows customers to purchase items that are listed on eBay's website for a fixed, listed price. Half.com, a wholly owned subsidiary of eBay, owns and operates an Internet website that allows users to search for goods posted on other Internet websites and to purchase those goods. At the time this action was brought, ReturnBuy owned and operated an Internet website that was hosted by the eBay website. Customers interested in purchasing goods from ReturnBuy would be directed from the ReturnBuy website to the eBay website, where items available for sale by ReturnBuy were displayed in an eBay listing.

Prior to trial, ReturnBuy filed for bankruptcy and entered into a settlement agreement with MercExchange. On motions for summary judgment by the other defendants, the district court ruled that claims 1-35 and 51-52 of the '051 patent were invalid for lack of enablement, 35 U.S.C. § 112, para. 1. The remainder of the case went to trial before a jury. At the conclusion of the trial, the jury found that eBay had willfully infringed claims 8, 10-11, 17-18, 20, 22, and 26-29 of the '265 patent and had induced ReturnBuy to infringe claims 1, 4, 7, and 23 of the '265 patent; that Half.com had willfully infringed claims 1, 5-6, 29, 31-32, and 34-39 of the '176 patent; and that neither the '265 patent nor the '176 patent was invalid. With respect to damages, the jury found eBay liable for $10.5 million for infringing the '265 patent and $5.5 million for inducing ReturnBuy to infringe the '265 patent. The jury also held Half.com liable for $19 million for infringing the '176 patent.

Following the verdict, eBay and Half.com moved for judgment as a matter of law ("JMOL") that the asserted claims of the '265 patent were not infringed and were invalid. In the alternative, eBay and Half.com moved for a new trial on the '265 patent. Half.com moved for JMOL that the asserted claims of the '176 patent were not infringed and were invalid. In the alternative, Half.com moved for a new trial on the '176 patent. In addition, eBay moved to set aside the $5.5 million award for inducing ReturnBuy to infringe the '265 patent. The district court denied the defendants' motions regarding infringement and validity, but granted eBay's motion to set aside the damages award for inducement of infringement. The court also denied MercExchange's motion for a permanent injunction, for enhanced damages, and for attorney fees.

The defendants appeal the denial of their motions for JMOL and for a new trial on the '265 and '176 patents. Because substantial evidence supports the jury's verdict regarding infringement and validity of the '265 patent, we affirm those aspects of the judgment. Because there is no substantial evidence to support the jury's verdict that eBay induced ReturnBuy to infringe the '265 patent, we reverse that aspect of the judgment. We also hold that the claims of the '176 patent are invalid for anticipation, and we therefore reverse the judgment in that regard and direct entry of judgment for Half.com on the '176 patent.

MercExchange cross-appeals, seeking reversal of the summary judgment of invalidity of the '051 patent and reversal of the district court's denial of a permanent injunction, enhanced damages, and attorney fees. MercExchange also cross-appeals the district court's order vacating the award of damages for inducement of infringement. Because the district court resolved a dispute of material fact on summary judgment and

improperly denied a permanent injunction, we reverse the denial of the permanent injunction, vacate the summary judgment order, and remand for further proceedings. However, we hold that the district court did not abuse its discretion in denying enhanced damages and attorney fees.

I

A

We turn first to the district court's denial of the defendants' motion for JMOL of noninfringement with respect to the '265 patent. The '265 patent pertains to a system for selling goods through an "electronic network of consignment stores." '265 patent, col. 1, line 8. To participate in the electronic network, a consignment store must obtain a "consignment node," which uses a computer to upload and save digital images and written information about goods to be sold over the network. A prospective buyer can electronically browse and search for goods stored in the databases of consignment nodes in the electronic network. After browsing and searching, the prospective buyer can purchase any good listed on the electronic network. Upon purchasing the good, the buyer can decide either to have the good shipped or to resell the good to another buyer over the electronic network. The patent refers to the decision to buy and resell as "speculating," because the system does not require the buyer to take possession of the good before reselling it and thereby allows the buyer to resell at a price that does not take into consideration the delays and costs associated with delivery.

The asserted claims each include a "transaction processor" that is used to complete the financial transaction accompanying the sale of a good. The transaction processor limitation of claim 8 reads as follows:

a transaction processor operably connected to said wide area communication network and said storage device, said transaction processor adapted to receive a purchase request and payment means from said participant, clear said purchase request and payment means and if said payment means clears then transfer the ownership of said good for sale by modifying said data record of said good for sale to reflect the new ownership of said good for sale by said participant.

The defendants contend that the district court erred in denying their motion for a JMOL of noninfringement because there was no substantial evidence from which a reasonable jury could conclude that eBay's system "transfer[red] the ownership" of a good for sale, as required by the transaction processor limitation.

As an initial matter, the defendants' arguments do not apply to claim 26 and dependent claims 27-29. The transaction processor limitation of claim 26 reads as follows:

a transaction processor operably connected to said wide area communication network and said storage device, said transaction processor adapted to receive a purchase request and electronic payment from said participant, transfer said purchase request to said posting terminal, and verify electronic payment information from said participant and if said electronic payment verifies then notify owner of said good for sale by modifying said data record indexed to said data record for sale to reflect said purchase request of said good for sale by said participant.

This claim language differs from the language of claim 8 in a significant way. While the transaction processor portion of claim 8 culminates in a step requiring the transaction processor to "transfer the ownership of said good for sale," the transaction processor portion of claim 26 culminates in a step requiring the transaction processor to "notify [the] owner of said good for sale . . . ." Claim 26 nowhere requires transfer of ownership of a good and does not even contain the term "ownership" or the term "transfer." The defendants argue that the transaction processor of claim 26 must be construed as limited to a transaction processor that transfers ownership by conveyance of title, but

03-1600,-1616                                    5

nothing in claim 26 supports that argument, and we reject it. Accordingly, we hold that the district court did not err in denying defendants' motion for JMOL with regard to noninfringement of claims 26-29. The remainder of our analysis is focused on the construction of claim 8 and its related claims.[1]

In its instructions to the jury, the district court provided the following interpretation of the "transfer the ownership" limitation:

> If the payment made by a participant for a good for sale clears, then the legal ownership is transferred by modifying the ownership entry in the data record of the good to reflect that the purchasing participant is the new owner of the good.

The defendants do not challenge the accuracy of that instruction, but they assert that the district court erred by failing to give two additional instructions. First, they contend that because the transaction processor limitation transfers the ownership of a "good for sale," the transaction processor must be capable of transferring legal title, and that the district court should have instructed the jury on the requirements for title transfer under the Uniform Commercial Code ("UCC"). Second, they contend that the district court failed to include in its jury instructions a statement from the court's pretrial claim construction order (the "<u>Markman</u> order") that transfer of ownership is "not limited to merely modifying the record—legal ownership must be transferred." The defendants argue that without that statement the jury was not informed of the requirement that legal title to the good must pass to the purchaser.

---

[1] Although claim 15 was not before the jury and is not at issue on appeal, the jury found infringement of various claims that depend on claim 15, i.e., claims 17-18, 20, and 22. Because claims 8 and 15 involve the same issues on appeal—the issues pertaining to the transfer of ownership limitation—our analysis of claim 8 pertains not only to the claims dependent on claim 8, but also to the claims dependent on claim 15.

In its post-trial order, the district court addressed and rejected both of those arguments. The court ruled that the defendants were not entitled to an instruction on title transfer under the UCC, because the transfer of ownership limitation did not require the transfer of legal title pursuant to the UCC. With respect to the statements from the court's Markman order, the court stated that it had already provided the jury with a sufficient claim construction and was under no obligation to include additional language that it used in its claim construction opinion.

We uphold the district court's interpretation of the transfer of ownership limitation and its decision not to provide the jury with additional instructions regarding that limitation. The district court's interpretation is consistent with the language of the claims and the specification of the '265 patent. Claim 8 states that a transaction processor accomplishes the "transfer [of] ownership of said good for sale by modifying said data record of said good for sale to reflect the new ownership of said good for sale by said participant." '265 patent, col. 21, ll. 51-54. The specification contains similar language, stating that the consignment node "transfers legal ownership of the good by changing the ownership entry in the data record in the consignment node of the good." Id., col. 12, ll. 46-48.

The claim and specification do not suggest that the modification of a data record in isolation is sufficient to transfer ownership under the patent. Rather, the specification makes clear that the modification of the data record reflects that a buyer has paid for the good and that it is the payment for the good, accompanied by the data record modification, that accomplishes the transfer of legal ownership. '265 patent, col. 19, ll. 11-13.

It is also important to understand that the patented system accomplishes a transfer of ownership in the context of a "trusted network," in which the owner of the patented system "may police the network to give quality control, detect fraud and revoke the users," id., col. 4, ll. 56-57, so that the network maintains a certain "quality and performance structure," id., col. 4, line 60, to guarantee payment and delivery of the good. The specification indicates that the "trusted network" of the invention is part of what allows ownership to pass upon modification of the data record. In light of the specification, we agree with the district court that within the context of the patent, transferring legal ownership is accomplished once the data record is modified.

The defendants argue that the modification of the data record by itself is not sufficient to transfer ownership, but rather that a "legal predicate" such as the UCC must be satisfied in order for the modification of the data record to have the effect of transferring ownership. In so arguing, the defendants rely on the use of the term "legal title" in the specification. The use of that term, however, does not mean that transfer of ownership must be equated with a formal transfer of title. Rather, the specification treats the term "legal title" as synonymous with the general concept of "ownership" as used in the patent. See, e.g., '265 patent, col. 19, ll. 11-13 ("[W]hen a bona fide purchase price is tendered by a participant . . . or another retailer . . . the legal title to a good as represented by the record will transfer to the buyer with an immediate or nearly immediate finality to the transaction."). The use of the term "legal title" in the specification therefore does not add any legal requirements to the transfer of ownership referred to in the claims, and does not negate the statements in the specification and in

the claim language that the transfer of ownership is accomplished upon the modification of the data and the clearing of payment in a trusted network.

We also agree with the district court that it was not necessary for the court to include excerpts from its Markman order in the jury instructions. A district court's Markman order is an explanation to the parties of the reasoning behind its claim construction. The court's analysis need not be part of the jury instructions. The defendants focus on the district court's statement in its Markman order that transfer of ownership is "not limited to merely modifying the record—legal ownership must be transferred," and they assert that the court's failure to convey the substance of that statement prejudiced them because it left room for MercExchange to assert in its closing argument that "[t]here is no requirement that legal title in that formal sense be transferred." The claims, however, do not require that title be transferred pursuant to any particular steps or legal formalities, and the district court's statement in its Markman order does not say so. It was therefore not error for the court to omit the requested instruction.

In light of the district court's claim construction, we find that MercExchange introduced sufficient evidence to permit the jury to find that eBay's system infringed the '265 patent. MercExchange's expert, Dr. Alfred Weaver, testified that "eBay has to transfer ownership by modifying the data record." He also made clear that the modification of the data record reflected the fact that payment had been made, as he stated that "when [ ] payment comes through, [eBay and Half.com] are authorized to transfer ownership by modifying [the] data record." Moreover, while eBay asserts that its system is not "trusted," we agree with the district court's statement in its post-trial

order that there was substantial evidence from which the jury could find that eBay's system was trusted, given the evidence in the record that the system provided "escrow services, conflict resolution services, insurance, payment intermediaries, authentication services, feedback forum, and the policing of the system." We therefore affirm the district court's denial of the defendants' motion for JMOL of noninfringement of the '265 patent.

B

In reviewing the defendants' motion to invalidate the '265 patent as a matter of law, the district court focused exclusively on obviousness and found that MercExchange "did indeed attack the merits of the defendants' prior art references and the failure of the defendants' witnesses to show how the prior art invalidated each of the claims of the '265 patent, despite the fact that the defendants argue otherwise." On appeal, the defendants argue that a reasonable jury would necessarily have found the asserted claims to be invalid because they are anticipated or rendered obvious by a prior art reference, U.S. Patent No. 5,664,111 ("the '111 patent"). The '111 patent pertains to a system for art dealers to sell artwork by using a network of computers. The system enables users to store and retrieve images and data pertaining to the artwork and to purchase artwork corresponding to the images.

As an initial matter, MercExchange argues that because the defendants' invalidity arguments were based solely on obviousness, they have waived their right to make an invalidity argument on appeal based on anticipation. We disagree. Because "anticipation is the epitome of obviousness," Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983), the defendants' obviousness arguments preserved their

right to argue invalidity based on anticipation, John Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1357 n.21 (Fed. Cir. 1998).

On the merits, the defendants argue that the '111 patent anticipates all of the asserted claims of the '265 patent and that MercExchange's expert, Dr. Weaver, failed to distinguish the system of the '111 patent from the system of the '265 patent. First, they assert that Dr. Weaver conceded on cross-examination that the '111 patent discloses the same transaction processor that is claimed in the '265 patent, because he admitted that the Patent and Trademark Office ("PTO") found that the '111 patent discloses a transaction processor and he did not contest the PTO's finding on that issue. However, while Dr. Weaver agreed that the PTO "would understand that [the '111 patent] discloses, among other things, transferring an ownership interest in an item," that testimony does not contradict his testimony that nothing in the '111 patent described a modification of the data record subsequent to payment verification. Thus, Dr. Weaver did not concede that the '111 patent disclosed the same transaction processor that is claimed in the '265 patent.

The defendants fail to address another distinction regarding the transaction processor limitation. In the '265 patent, a transaction processor is designed to receive payments by "entering a credit card number and expiration date or other forms of electronic payment." '265 patent, col. 5, ll. 6-8. The system claimed by the '111 patent, however, does not receive payments electronically. Rather, the system "requests that the buying dealer wire transfer funds to pay for the purchased work." '111 patent, col. 14, ll. 62-64. Instead of being able to complete a transaction on the electronic network,

a buyer using the invention of the '111 patent must temporarily leave the system to make a payment before the transaction can be completed.

The defendants also contend that Dr. Weaver failed to distinguish the '265 patent from the '111 patent with regard to the posting terminal apparatus limitation and in particular the use of an identification code to prevent certain dealers from logging on to the system. The defendants argue that Dr. Weaver conceded that the '111 patent discloses the same identification code as the '265 patent. They cite Dr. Weaver's testimony on cross-examination, in which he stated that the system claimed by the '111 patent "used the terminal identification code to limit the access of certain dealers to certain pieces of art." Dr. Weaver stated on redirect examination, however, that the identification code used in the '111 system is not the same as the identification code used for terminal authorization in the posting terminal apparatus claimed in the '265 patent: "All that's happening in [the '111 patent] is that a person is identifying himself with a code. And in my mind that's not at all consistent with the way the Court defined the posting terminal apparatus code," i.e., as a code that "identifies the hardware and/or software of the posting terminal apparatus." From that testimony, a reasonable jury could infer that while the identification code in the '111 patent is directed to preventing access by a specific dealer, the identification code in the '265 patent is not dealer-specific, but serves instead to screen out terminal apparatuses that lack particular technical requirements. The evidence thus provided a sufficient basis for the jury to conclude that the '111 patent did not anticipate the asserted claims of the '265 patent.

We also reject the defendants' argument that the '111 patent renders the asserted claims of the '265 patent obvious. Dr. Weaver testified that the patented

invention differs from the '111 patent in both structure and method and that a person of ordinary skill in the art would not be motivated to modify the system covered by the '111 patent to create the system claimed in the '265 patent. For example, with regard to the posting terminal apparatus of the '265 patent, Dr. Weaver testified that one of ordinary skill in the art would not be motivated "to change or modify the dealer ID code in [the '111 patent system] to conform to the user ID protocols of the '265 patent's posting terminal apparatus," as the two are "dramatically different operations" that are used for different purposes. In light of Dr. Weaver's testimony, we agree with the district court that there was substantial evidence to support the jury's finding of nonobviousness.

C

The defendants contend that they are entitled to JMOL on the theory that eBay was not shown to have induced ReturnBuy to infringe four of the claims of the '265 patent. Claim 1 is representative of three of the asserted claims—claims 1, 4, and 7. It provides:

1. A system for presenting a data record of a good for sale to a market for goods, said market for goods having an interface to a wide area communication network for presenting and offering goods for sale to a purchaser, a payment clearing means for processing a purchase request from said purchaser, a database means for storing and tracking said data record of said good for sale, a communications means for communicating with said system to accept said data record of said good and a payment means for transferring funds to a user of said system, said system comprising:
   a digital image means for creating a digital image of a good for sale;
   a user interface for receiving textual information from a user;
   a bar code scanner;
   a bar code printer;
   a storage device;
   a communications means for communicating with the market; and
   a computer locally connected to said digital image means, said user interface, said bar code scanner, said bar code printer, said storage device digital image of said good for sale from said digital image

means, generate a data record of said good for sale, incorporate said digital image of said good for sale into said data record, receive a textual description of said good for sale from said user interface, store said data record on said storage device, transfer said data record to the market for goods via said communications means and receive a tracking number for said good for sale from the market for goods via said communications means, store said tracking number from the market for goods in said data record on said storage device and printing a bar code from said tracking number on said bar code printer.

The only other asserted claim, claim 23, differs from claim 1 in that claim 23 recites a "digital camera for creating an image," instead of a "digital image means for creating a digital image," and it recites a "printer for printing said digital image of said good for sale."

According to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." We have construed that statute to require proof of intent, although there is a "lack of clarity concerning whether the required intent must be merely to induce the specific acts [of infringement] or additionally to cause an infringement." Insituform Techs., Inc. v. CAT Contracting, Inc., 385 F.3d 1360, 1378 (Fed. Cir. 2004), citing Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990), and Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990). Nevertheless, a patentee must be able to demonstrate at least that the alleged inducer had knowledge of the infringing acts in order to demonstrate either level of intent.

MercExchange asserts that the evidence was sufficient for the jury to find that eBay had induced infringement based on the testimony of ReturnBuy's former CEO and its former CTO. MercExchange points to testimony that eBay had invested $2 million in ReturnBuy and had an "observer" on ReturnBuy's board of directors; that eBay granted

ReturnBuy the right to post goods in volume on the eBay system; that eBay was the "primary venue" for ReturnBuy's sales; and that eBay supplied engineers to work with ReturnBuy to facilitate the posting of goods for sale through eBay. That evidence, however, does not establish that eBay induced ReturnBuy to infringe the asserted claims.

First, the testimony regarding eBay's investment in ReturnBuy's business and its presence on ReturnBuy's board of directors does not demonstrate an intent to induce infringement, or even show that eBay had knowledge of any acts of infringement by ReturnBuy. Rather, investment and board presence merely indicate that there was a business relationship between the two companies and that eBay had a financial interest in ReturnBuy's business.

Other testimony presented by ReturnBuy's CEO and its CTO demonstrates, at best, that eBay encouraged ReturnBuy to post goods for sale on eBay's website. Posting goods for sale, however, is relevant to only one limitation of the claims, i.e., "a communications means for communicating with the market." There is no testimony or other record evidence that eBay intended to induce ReturnBuy to incorporate the other limitations of the asserted claims. For example, claim 1 requires the use of a bar code scanner and a bar code printer. The specification explains and the record shows that the bar code scanner and printer are used for tracking goods. There is nothing in the record to show that eBay had any intention to induce ReturnBuy to use bar code scanners and printers to keep track of its inventory.

Likewise, claim 23 contains limitations requiring the use of a digital camera and printer, but there is nothing in the record to demonstrate that eBay intended to induce

ReturnBuy to use those devices to create the digital image used for posting. While eBay required ReturnBuy to provide a digital image and an accompanying data record for the goods that ReturnBuy wanted to sell on its website, nothing in the record shows that eBay induced ReturnBuy to use a digital camera or a printer to create either the digital image or the accompanying data record, since digital images may be created by other means, such as by scanning developed photographs. Therefore, the evidence is insufficient to demonstrate that eBay intended to induce ReturnBuy to infringe claim 23.

Accordingly, we reverse the portion of the judgment holding eBay liable for inducing ReturnBuy to infringe the '265 patent. In light of our disposition of that issue, it is unnecessary for us to address MercExchange's argument that the district court erred when it vacated the jury's award of damages on the inducement claim as duplicative.

II

We turn next to issues pertaining to the '176 patent. Each of the asserted claims of the '176 patent recites a method for searching "a plurality of electronic markets" to locate an item. That method uses a network of computers to accomplish each search. One computer receives and processes a search request from a participant and transmits that request to other computers through a software search agent. After search results are obtained, they are sent back to the participant's computer.

Following trial, the district court denied Half.com's motion for JMOL that the '176 patent was not infringed and is invalid. We reverse that ruling. Because we base our reversal on invalidity, we need not reach the issue of infringement.

A

Half.com's invalidity argument turns on the construction of the claim term "electronic market." At trial, the district court instructed the jury that the term electronic market means a "trusted network or system where participants can buy, sell, search or browse goods online." Half.com asserts that the district court's construction of electronic market requires that each of the searched websites be capable of performing four functions: buying, selling, searching, and browsing. As the basis for its interpretation of the district court's construction of that term, Half.com relies heavily on the use of the word "and" to connect the four functions in a statement from the district court's <u>Markman</u> order, in which the court said, "Based on the inventor's clear intent to allow users to buy, sell, search and browse for items in the electronic market, the court finds that the completion of a transaction between buyer and seller is not required."

In its post-trial order, the district court rejected Half.com's interpretation of the court's claim construction. The court stated that "[t]here was nothing in [the] claim construction that required the electronic market to do all four functions cited."

We agree with the district court that the patent does not require the electronic market to perform all four functions. The '176 patent is designed in part to provide a system that allows participants to speculate, i.e., to buy an item and then promptly sell it at a higher price. That is the purpose to which Half.com alludes in contending that the patent requires the electronic market to be able to handle not only buying but also selling. The specification makes clear, however, that speculation is not the only use for the system, and that there are other purposes for the system in the context of "the two-tiered market of dealer-to-dealer and retail markets." '176 patent, col. 16, ll. 28-29. One

of the main purposes of the patented system is to create a double-tiered market for goods, "where the first tier is a retail price and the second tier is a wholesale or dealer to dealer price[,] and an authorized dealer has pre-approved access to the dealer-to-dealer price and may charge and display the retail price to a local store customer." Id., col. 1, ll. 49-51. The specification provides that "[t]he price and reserve price fields may be used to structure the two-tiered market of dealer-to-dealer and retail markets." Id., col. 16, ll. 27-29. It further provides that "[a] dealer may be provided with special logon identifications and passwords to view the reserve price . . . and reserve price indicator" that is not accessible to retail purchasers. Id., col. 16, ll. 31-33. However, if a retail dealer purchases an item, he may choose to sell to other retail dealers or to retail customers. In that situation, the retail dealer may enter a retail price and a wholesale price into the system. Id., col. 16, ll. 40-41. The retail price may then be displayed to the retail customer. Id., col. 16, ll. 41-42.

Importantly, when a retail customer decides to participate in the system, the retail customer, after browsing and searching, has only the option of purchasing goods. The customer is not allowed to sell goods to the retail dealer. That is, while dealers are able to act as participants in the dealer-to-dealer market by buying from and selling to other dealers, customers in the retailer-to-customer market are not allowed the same freedom. The description of the retail-to-retail market discloses two types of electronic markets—those in which a participant can buy, browse, and search, and those in which a participant can sell, browse, and search. The description of the use of the invention for speculation discloses a third type of electronic market—one in which a participant can buy and sell as well as browse and search. Accordingly, we agree with the district

court's definition of electronic markets as markets in which the participants, in addition to browsing and searching, may either buy or sell or do both.

B

At trial, Half.com argued that the district court should enter a JMOL of invalidity because there was clear and convincing evidence that the asserted claims were rendered obvious in view of expert testimony and several publications, including an article by Arthur Keller. The district court rejected Half.com's argument, stating that "[w]hen the evidence on invalidity is viewed in the light most favorable to the plaintiff, the court cannot find that there was a complete absence of evidence supporting the verdict that the jury's findings could only be the result of sheer surmise and conjecture."

On appeal, Half.com again contends that the asserted claims of the '176 patent were anticipated or obvious in light of the prior art. In response, MercExchange first asserts that Half.com waived its right to make any argument on appeal based on anticipation because it failed to do so at trial. As we noted earlier, however, making an invalidity argument based on obviousness preserves the right to argue anticipation on appeal. Because Half.com argued invalidity based on obviousness at trial, it has preserved its right to make an argument regarding anticipation on appeal.

On the merits, we agree with Half.com that no reasonable jury could have found the asserted claims of the '176 patent to be valid. The Keller article discloses each of the limitations of the asserted claims, and the article is enabling. The article describes a system to conduct a "cross-search of multiple catalogs" by using a network of computers hosting online catalogs. The article recognizes the problem of an online

buyer's having to search multiple online catalogs, and it solves that problem by presenting a system for searching multiple online catalogs using search agents.

In addition to disclosing each of the limitations of the asserted claims, the Keller article enables a person of ordinary skill to practice its system by disclosing the communication language of the search agents, i.e., KQML and KIF ontologies. It also provides a flow chart that describes how the system operates, including how the user interfaces with the system, i.e., by using HTML/HTTP protocols, and how a search agent retrieves product data, i.e., by using SQL. Contrary to MercExchange's assertion, the Keller article that describes how to make the system is not a mere laundry list of factors.

MercExchange argues that the Keller article fails to disclose all the limitations of the '176 patent because it fails to disclose a method for searching "electronic markets" but instead searches for "catalogs." MercExchange asserts that, unlike the electronic market claimed in the '176 patent, a catalog guarantees a participant the right to browse and search, but does not guarantee the ability either to buy or to sell a particular good. However, the Keller article clearly describes a system that searches catalogs that are serviced by what the article calls "vendors," who offer products for sale. Accordingly, the Keller article contemplates a system in which a participant is able to search, browse, and buy. Because a participant is able to buy goods in the market, that is sufficient to satisfy the "buy or sell" requirement of the asserted claims. In sum, we conclude that the Keller article discloses each limitation of the asserted claims of the '176 patent, and for that reason we hold that those claims are anticipated.

III

The defendants contend that they are entitled to a new trial because the district court erred in instructing the jury on the definition of several terms used in the '265 patent. With respect to the term "transaction processor," the defendants repeat the same argument they made in addressing the district court's denial of their motion for JMOL of noninfringement and invalidity, i.e., that they were prejudiced because the instruction on that term differed from the court's <u>Markman</u> order. As we have explained, we agree with the district court's jury instruction on that claim term, and the court was not required to instruct the jury in strict conformity with the language of its pretrial <u>Markman</u> order.

With regard to the terms "electronic markets" and "market apparatus," the defendants assert that the district court erred by failing to give jury instructions that those terms do not encompass "person-to-person" systems, but instead include only trusted networks that could transfer ownership. The defendants contend that the district court should have instructed the jury that electronic markets do not include "person-to-person" contacts. If it had done so, they argue, no reasonable jury could have found that eBay infringes, because eBay uses a "person-to-person" system.

The defendants' contention that the '265 patent prohibits buyers and sellers from having direct contact finds no support in the '265 patent. The court was therefore correct not to include that interpretation in the jury instructions. Moreover, to the extent that the defendants contend that the district court's <u>Markman</u> order embraced their theory that the patent excluded person-to-person systems, they are incorrect. In its <u>Markman</u> order, the district court stated that "the patent teaches away from person-to-

person auctions, favoring a system with a trusted intermediary." However, the court never defined what a "person-to-person" system entails. Rather, it merely determined that an electronic market must be a "trusted network or system," which is the correct interpretation.

IV

In its cross-appeal, MercExchange contests the summary judgment of invalidity as to the asserted claims of the '051 patent, and it asserts that the district court erred in construing certain terms used in that patent. MercExchange also challenges the district court's post-trial order denying MercExchange's request for a permanent injunction, enhanced damages, and attorney fees, and reducing the amount of the damages award by eliminating the $5.5 million in damages for eBay's inducement to infringe.

A

Prior to trial, the defendants asserted that the claims of the '051 patent were invalid because the written description is inadequate to support either "establish[ing] a seller's account" or "debiting [or charging] a seller's account" for a fee. Claim 12 contains both terms and is representative of the independent claims at issue with regard to the '051 patent:

> A computer-implemented method for facilitating Internet-based auctions, the method comprising:
>
> Requiring a seller to establish a seller's account, the seller's account being based at least on the seller's identity and a financial instrument associated with the seller;
> Initiating an Internet-based auction for an item offered by the seller; and
> Debiting the seller's account for a fee amount corresponding to a result of the auction.

The district court concluded, on summary judgment, that the reference to "establish[ing] a seller's account" was adequately supported by the written description, but that the process of "debiting the seller's account for a fee" was not. The court therefore held the asserted claims of the '051 patent invalid.

The district court construed the term "debiting a seller's account" to mean "record[ing] a debt (or charge) against a person's name or account." The court held that the written description of the patent provided support for recording a credit to a seller's account, but not for recording a debit against the seller's account. In so ruling, the court relied heavily on a statement from the written description that "[a]fter the transaction clears the charge . . . , the consignment node credits the consignment node user's commission account . . . to extract the consignment node transaction fee." '051 patent, col. 12, ll. 52-55. The court interpreted that statement as describing a process in which the consignment node takes the proceeds of a sale from the buyer, takes a commission or fee, credits the seller's account with the balance, and transfers that amount to the seller. Because the seller never owes money to the node, the court concluded that debiting never occurs in the disclosed process.

MercExchange argues that the joint declaration of its experts created a genuine issue of material fact as to the adequacy of the written description. The declaration explained that a person of ordinary skill in the art would understand the process of extracting a fee or commission, as described in the written description, to involve "debiting a seller's account." We agree. The written description refers to the seller's agreement to allow the consignment node user to extract a consignment fee or commission following the sale. See '051 patent, col. 4, ll. 30-34; col. 5, ll. 37-39. It also

refers to the consignment node user's creating a credit or deposit account for the participant and crediting the consignment node user's commission account to extract the commission. See id., col. 12, ll. 44-46, 52-55. According to MercExchange's experts, a person of ordinary skill in the art would understand that creating a credit, as described in the specification, would require creating a corresponding debit against the proceeds due to the seller. Hence, MercExchange provided evidence that the specification would be understood by a person of skill in the art to describe a process that includes debiting the seller's account.

We thus conclude that MercExchange introduced sufficient evidence that the '051 patent was not invalid for lack of written description to create a genuine issue of material fact on that issue. Accordingly, we vacate that aspect of the judgment and remand for further proceedings.

B

In connection with its challenge to the court's order invalidating the '051 patent, MercExchange argues that the district court made three errors in construing the claims of that patent. As an initial matter, the defendants assert that this court lacks jurisdiction to hear MercExchange's appeal regarding those errors because the construction of those terms was not relevant to the final judgment. Specifically, the defendants argue that this court should address only claim construction issues pertaining to the term "debiting," because that term was the sole basis for the district court's summary judgment determination. Because we are vacating and remanding with respect to the '051 patent, we have jurisdiction to address issues that may arise on remand, as part of our statutory authority to "require such further proceedings to be had as may be just

under the circumstances." 28 U.S.C. § 2106. It is likely that the district court will be required to deal not only with the application of the term "debiting," but also with the application of other terms used in the '051 claims. Accordingly, we elect to address MercExchange's challenges to other claim construction issues at this juncture.

First, MercExchange challenges the construction of the term "auction," asserting that the district court erred in construing the term as "a process over a trusted network, or with a trusted intermediary." MercExchange argues that the district court should not have required a "trusted" element. We disagree. The district court's construction is supported by the language of the specification, which states that the purpose of the patented system is "to provide a trusted network of consignment nodes that act as brokers to provide a means to electronically present a used good or collectable to an electronic market." '051 patent, col. 2, ll. 12-14.

Second, MercExchange challenges the district court's construction of the following claim limitation, which appears in claims 10 and 12:

> Requiring a seller to establish a seller's account, the seller's account being based at least on the seller's identity and a financial instrument associated with the seller.

In its Markman order, the district court ruled that "a seller's account must be established based at least on the seller's identity and a financial instrument associated with the seller." MercExchange disagrees with the district court's construction on the ground that the comma between the words "account" and "the" in the claim makes the "identity" and "financial instrument" features optional. If the patentee had intended the two to be mandatory, MercExchange argues, the limitation would not have used a comma and

would have read: "requiring the seller to establish a seller's account based at least on the seller's identity and a financial instrument associated with the seller."

MercExchange's textual argument is unconvincing. The claim states that a seller must establish "a seller's account," and then, after the comma, the word "seller's account" is used a second time and is directly preceded by the article "the." The use of the definite article indicates that the second use of the term "seller's account" refers to the term directly preceding the comma. We uphold the district court's construction.

Finally, MercExchange asserts that the district court erred in construing the preamble phrases "automated method, performed by a computer-based auction system," and "computer-implemented method of conducting Internet-based auctions" in various claims of the '051 patent. The district court held that those phrases do not require that all steps following the preamble be performed by an automated process, as argued by MercExchange. Rather, only the steps that are claimed to occur automatically are required to be performed in that manner. MercExchange contends that the court's interpretation is inconsistent with the portion of the specification entitled "Computer Implementation," which provides different operating systems and platforms for use in a preferred embodiment of the invention. '051 patent, col. 7, line 59 through col. 8, line 9. That portion of the specification does not support MercExchange's argument, however. Various limitations of the relevant claims require actions by participants and cannot be "automatically performed via an automated process." For example, as the district court stated in its Markman order, claim 1 contains a limitation requiring that the computer system "receiv[e] bids on the item from participants." That step requires that participants enter their bids manually and cannot occur automatically.

Likewise, one step of claim 12 requires that a seller "establish a seller's account." That step also requires that a seller manually enter relevant information into the system. Accordingly, the district court was correct in holding that not all steps had to be performed by way of an automated process.

C

MercExchange challenges the district court's refusal to enter a permanent injunction. Because the "right to exclude recognized in a patent is but the essence of the concept of property," the general rule is that a permanent injunction will issue once infringement and validity have been adjudged. Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246-47 (Fed. Cir. 1989). To be sure, "courts have in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest." Rite-Hite Corp. v. Kelley, Inc., 56 F.3d 1538, 1547 (Fed. Cir. 1995); see Roche Prods., Inc. v. Bolar Pharm. Co., 733 F.2d 858, 865-66 (Fed. Cir. 1984) ("standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief"). Thus, we have stated that a court may decline to enter an injunction when "a patentee's failure to practice the patented invention frustrates an important public need for the invention," such as the need to use an invention to protect public health. Rite-Hite Corp., 56 F.3d at 1547.

In this case, the district court did not provide any persuasive reason to believe this case is sufficiently exceptional to justify the denial of a permanent injunction. In its post-trial order, the district court stated that the public interest favors denial of a permanent injunction in view of "a growing concern over the issuance of business-method patents, which forced the PTO to implement a second level review policy and

cause legislation to be introduced in Congress to eliminate the presumption of validity for such patents." A general concern regarding business-method patents, however, is not the type of important public need that justifies the unusual step of denying injunctive relief.

Another reason the court gave for denying a permanent injunction was that the litigation in this case had been contentious and that if a permanent injunction were granted, the defendants would attempt to design around it. That strategy, in turn, would result in "contempt hearing after contempt hearing requiring the court to essentially conduct separate infringement trials to determine if the changes to the defendants' systems violates the injunction" and in "extraordinary costs to the parties, as well as considerable judicial resources."

The court's concern about the likelihood of continuing disputes over whether the defendants' subsequent actions would violate MercExchange's rights is not a sufficient basis for denying a permanent injunction. A continuing dispute of that sort is not unusual in a patent case, and even absent an injunction, such a dispute would be likely to continue in the form of successive infringement actions if the patentee believed the defendants' conduct continued to violate its rights.

The trial court also noted that MercExchange had made public statements regarding its willingness to license its patents, and the court justified its denial of a permanent injunction based in part on those statements. The fact that MercExchange may have expressed willingness to license its patents should not, however, deprive it of the right to an injunction to which it would otherwise be entitled. Injunctions are not reserved for patentees who intend to practice their patents, as opposed to those who

choose to license. The statutory right to exclude is equally available to both groups, and the right to an adequate remedy to enforce that right should be equally available to both as well. If the injunction gives the patentee additional leverage in licensing, that is a natural consequence of the right to exclude and not an inappropriate reward to a party that does not intend to compete in the marketplace with potential infringers.

Finally, we do not agree with the court that MercExchange's failure to move for a preliminary injunction militates against its right to a permanent injunction. A preliminary injunction is extraordinary relief that is available only on a special showing of need for relief pendente lite; a preliminary injunction and a permanent injunction "are distinct forms of equitable relief that have different prerequisites and serve entirely different purposes." Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). We therefore see no reason to depart from the general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances. Accordingly, we reverse the district court's denial of MercExchange's motion for a permanent injunction.

D

MercExchange argues that the district court abused its discretion by refusing to enhance damages and award attorney fees. MercExchange asserts that the district court erred in its analysis of the factors set forth in Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992). The defendants respond that the district court properly considered each of the Read factors. We agree with the defendants. In determining that MercExchange was not entitled to enhanced damages, the district court carefully analyzed each of the Read factors and based its conclusions on the jury's factual

findings and evidence in the record. In analyzing those factors, the court did not abuse its discretion.

The court also addressed the relevant factors that bear on whether to award attorney fees, including "the degree of culpability of the infringer," "the closeness of the question," and "litigation behavior." Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1378 (Fed. Cir. 2001), quoting Nat'l Presto Indus., Inc. v. W. Bend Co., 76 F.3d 1185, 1197 (Fed. Cir. 1996). Again, the court did not abuse its discretion in applying those factors in the factual context of this case. We therefore affirm the portion of the judgment denying an award of enhanced damages or attorney fees.

Each party shall bear its own costs for this appeal.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, and REMANDED.